UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DWIGHT JEROME SMITH,

               Petitioner,

v.                                    CASE NO. 07-13215
                                    HONORABLE NANCY G. EDMUNDS
LINDA METRISH,

               Respondent.

_____/

**OPINION AND ORDER DENYING THE HABEAS PETITION,**
**GRANTING IN PART A CERTIFICATE OF APPEALABILITY, AND**
**GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Petitioner Dwight Smith has filed a *pro se* habeas corpus petition challenging his

Wayne County, Michigan convictions for murder and two firearm offenses.  Respondent

Linda Metrish urges the Court to deny the petition.  The Court has concluded from a review

of the pleadings and record that Petitioner is not entitled to habeas relief.  Accordingly, the

petition will be denied.

**I.  Background**

Petitioner was charged with premeditated murder, felon in possession of a firearm,

and possession of a firearm during the commission of a felony.  The charges arose from

> a shooting which occurred on January 9, 2002.  Detroit Police responded to
> a complaint of a shooting at a house in the city of Detroit, and upon their
> arrival, the responding officers heard someone inside stating, "help me I'm
> shot."  Upon entering the dwelling, they found the victim, Demon Mitchell,
> lying face down behind the front door.  Although the victim was having
> difficulty breathing, he was able to communicate to police that he had been
> shot in an upstairs bathroom.  When the victim was asked who shot him, it
> sounded like he said "Dwayne Smith."  The victim was alone in the house

when found.  No weapons were found at the scene, and there were no signs of forced entry.  The victim later died of his wounds, and an autopsy revealed that he had been shot twice.

Dwayne Smith, [Petitioner's] brother, was brought to the police station for questioning, but it was determined that Dwayne had been at work at the time of the shooting.  The police subsequently arrested [Petitioner].  After being informed of his constitutional rights, [Petitioner] made three statements while in custody. [Petitioner] essentially admitted that he shot the victim, but asserted that the gun discharged during a struggle with the victim and that he shot the victim in self defense during an argument.

*People v. Smith*, No. 260242, 2006 WL 3457838, at *1 (Mich. App. Nov. 30, 2006) (unpublished).

On November 14, 2002, a Wayne County Circuit Court jury found Petitioner guilty, as charged, of first-degree (premeditated) murder, Mich. Comp. Laws § 750.316, felon in possession of a firearm, Mich. Comp. Laws § 750.227f, and possession of a firearm during the commission of, or attempt to commit, a felony, Mich. Comp. Laws § 750.227b.  The trial court sentenced Petitioner to two years in prison for possessing a firearm during the commission of a felony, followed by concurrent terms of life imprisonment for the murder and three to five years in prison for being a felon in possession of a firearm.  The Michigan Court of Appeals affirmed Petitioner's convictions, *see Smith*, 2006 WL 3457838, and on April 24, 2007, the Michigan Supreme Court denied leave to appeal, *see People v. Smith*, 729 N.W.2d 849 (Mich. 2007) (table).

Petitioner filed his habeas corpus petition pursuant to 28 U.S.C. § 2254 on August 2, 2007.  The grounds for relief read:

I.      The evidence is insufficient to support the conviction of first-degree, premeditated murder and Defendant has been denied due process of law.  US CONST AM XIV.

II.     Defendant's confession was involuntary and its admission at

2

trial denied Defendant his Fifth and Fourteenth Amendment rights.  US CONST AM V.

III.    Defendant was denied his right to a fair trial and effective assistance of counsel by his attorney's failure to present evidence that he was suffering from post-traumatic stress disorder.  US CONST AM VI, XIV.

IV.    Defendant was denied a fair trial and a properly instructed jury when the trial court failed to instruct on the necessarily included lesser offense of involuntary manslaughter.  US CONST AM XIV.

V.    The trial court erred in denying Defendant's motion to dismiss the felon in possession of a firearm charge because more than five years had passed and the prosecutor failed to prove all elements of the offense.

Respondent argues in an answer to the habeas petition that Petitioner's fourth claim is procedurally defaulted and not cognizable on habeas review and that Petitioner's other claims lack merit because the state court's adjudication of the claims was objectively reasonable.

## II.  Standard of Review

Section 2254(d) of Title 28, United States Code, imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Additionally, this Court must presume the correctness of a state court's factual determinations. 28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

## III. Discussion

### A. Sufficiency of the Evidence

Petitioner alleges that the evidence adduced at trial was insufficient to support his first-degree murder conviction. He concedes that he argued with the victim and that the two of them struggled over possession of a gun, but he claims that there was no evidence of premeditation and deliberation. He maintains that the killing was justified because (1) he was acting in self defense when the gun discharged, (2) the shooting was accidental, or (3) the shooting was a result of temporary excitement induced by adequate provocation. The Michigan Court of Appeals determined on review of this claim that "there was sufficient evidence presented at trial from which a rational jury could find premeditation and deliberation." *Smith*, 2006 WL 3457838, at *2.

4

### 1.  Legal Framework

The question on habeas review of a sufficiency-of-the-evidence claim "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana,* 406 U.S. 356, 362 (1972)) (emphasis in original).  "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id.*

Courts must apply the *Jackson* standard "with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Id.* at 324 n.16.  The elements of first-degree, premeditated murder are:  (1) the defendant killed the victim and (2) the killing was "willful, deliberate, and premeditated."  *People v. Bowman*, 656 N.W.2d 835, 841 (Mich. Ct. App. 2002) (quoting Mich. Comp. Laws § 750.316(1)(a)).

The only element in dispute here is whether Petitioner premeditated and deliberated the killing.  "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. [P]remeditation and deliberation characterize a thought process undisturbed by hot blood."  *People v. Morrin*, 187 N.W.2d 434, 449 (Mich. Ct. App. 1971) (footnotes omitted).  Premeditation and deliberation may be inferred from "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide."  *People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992).  "A pause between the initial homicidal intent and the ultimate act may, in the appropriate circumstances, be sufficient for premeditation and deliberation."  *People v. Plummer*, 581

5

N.W.2d 753, 757 (Mich. Ct. App.1998) (citing *People v. Tilley*, 273 N.W.2d 471 (Mich. 1979). "Although there is no specific time requirement, sufficient time must have elapsed to allow the defendant to take a 'second look.'" *Id.* (citing *People v. DeLisle*, 509 N.W.2d 885 (Mich. Ct. App. 1993); *People v. Anderson*, 531 N.W.2d 780 (Mich. Ct. App. 1995)).

### 2. Application

The Michigan Court of Appeals summarized and analyzed the pertinent evidence as follows:

> [A]lthough [Petitioner] and the victim were involved in an argument, the argument was interrupted when someone came to the victim's door. The victim put the gun down, essentially stopping the fight. [Petitioner] had a sufficient opportunity for a "second look" during this time. [Petitioner] did not leave the situation. Instead, [Petitioner] took possession of the gun. Moreover, after the victim finished his business at the door, [Petitioner] shot the victim. When the victim subsequently retreated upstairs, [Petitioner] followed him and shot him a second time.

*Smith*, 2006 WL 3457838, at *2.

A rational juror could have concluded from this evidence that Petitioner premeditated and deliberated the murder. As the state court recognized, Petitioner could have left the house when Mitchell laid the gun. Instead, he grabbed the gun, resumed the fight with Mitchell, and discharged the gun. He subsequently followed Mitchell upstairs. According to his own statement to the police, he then "pulled [Mitchell] back" and fired again. Petitioner had enough time to take a second look at his actions when Mr. Mitchell put down the gun and again when Mitchell walked upstairs.

Petitioner contends that the killing was justified because (1) he was acting in self defense when the gun discharged, (2) the shooting was accidental, or (3) the shooting was done as a result of temporary excitement induced by adequate provocation. Evidence that

6

Mitchell was shot once in the back[1] is an indication that Petitioner did not fire in self defense.  And evidence that Petitioner followed Mr. Mitchell upstairs, grabbed him, and shot him there demonstrates that at least one gunshot was not purely accidental.   Even assuming that Mr. Mitchell initially provoked Petitioner by accusing him of taking his drugs and money and threatening to kill Petitioner, there were "lapse[s] of time during which a reasonable person could control his passions."  *People v. Mendoza*, 664 N.W.2d 685, 690 (2003).  Therefore, the evidence did not support a manslaughter verdict.

If Petitioner had honestly believed that the shooting was justified, he likely would have called the police or requested assistance for Mitchell after the shooting instead of leaving the house.  The jury could infer consciousness of guilt from evidence that Petitioner fled the scene of the crime and initially lied to the police and to his brother about the incident.  *People v. Unger*, 749 N.W.2d 272, 288 (Mich. Ct. App. 2008) (lies and deception); *People v. Coleman*, 532 N.W.2d 885, 887 (Mich. Ct. App. 1995) (flight).  The Court notes, moreover, that it was "not necessary for the evidence to exclude every reasonable hypothesis except that of guilt."  *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir. 1992).

In conclusion, a rational juror who viewed the evidence in the light most favorable to the prosecution could have found that Petitioner premeditated and deliberated the murder and that the prosecutor proved his case beyond a reasonable doubt.  The state court's decision – that the evidence supported a finding of premeditation and deliberation

---

[1] The assistant medical examiner who performed the autopsy testified that Mr. Mitchell also sustained an entry wound to his right temple.  (Tr. Nov. 13, 2002, at 102-04, 107, 111.)

– was not contrary to, or an unreasonable application of, *Jackson*.

**B. Petitioner's Statements to the Police**

Petitioner asserts that his confession to the police was involuntary and, therefore, its admission at trial deprived him of his rights under the Fifth and Fourteenth Amendments to the United States Constitution. Specifically, Petitioner contends that his confession was extracted through intimidation and psychological coercion by a professional interrogator over a period of eleven hours. In addition, Petitioner alleges that the police denied his requests for an attorney and for permission to make a telephone call. He claims that his physical condition (acute myeloid leukemia) and his emotional condition (post-traumatic stress disorder) were ignored. He also claims that the officers threatened to charge his brother and that he was promised a charge of manslaughter instead of murder if he made a statement. The trial court determined that Petitioner's statement to the police was voluntary, and the Michigan Court of Appeals determined that the trial court's ruling did not amount to clear error.

**1. Clearly Established Federal Law**

The test for the voluntariness of a confession is whether "'the confession [was] the product of an essentially free and unconstrained choice by its maker[.] If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961)). When determining whether a defendant's will was overborne in a particular case, courts assess

the totality of all the surrounding circumstances-both the characteristics of the

8

accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

*Id.* at 226 (citations omitted). Courts must "determine[] the factual circumstances surrounding the confession, assess[] the psychological impact on the accused, and evaluate[] the legal significance of how the accused reacted." *Id.* To be free and voluntary, a confession "'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *Bram v. United States,* 168 U.S. 532, 542-43 (1897) (quoting 3 Russ. Crimes (6th Ed.) 478).

### 2. The Facts

The record indicates that Petitioner was arrested about 12:30 p.m. or 1:00 p.m. on January 9, 2002. Police Officer Moises Jimenez talked to Petitioner at approximately 2:30 p.m. that day. Officer Jimenez testified at a hearing on Petitioner's motion to suppress his statements that he informed Petitioner of his constitutional rights and that Petitioner claimed to understand his rights. Petitioner initiated each of the constitutional rights on the waiver-of-rights form and signed the form. He did not appear to be intoxicated or high from narcotics at the time.

Officer Jimenez then took a statement from Petitioner because Petitioner expressed a desire to talk to the officer. Jimenez testified that he did not use any tricks on Petitioner, he did not threaten Petitioner, he did not promise to charge Petitioner with involuntary manslaughter if he talked, and he did not deprive Petitioner of food, water, or bathroom

9

breaks.  He offered Petitioner a sandwich and a beverage, and Petitioner signed his statement after reviewing it with Jimenez.  Petitioner did not ask to speak to a lawyer, he did not mention that he suffered from post-traumatic stress disorder, and he did not request permission to make a telephone call until after he made his second statement to Jimenez. The statement took about an hour and a half to complete, but Jimenez was in contact with Petitioner off and on from about 1:00 p.m. to midnight that day.  (Tr. May 6, 2002, at 16-31.) This statement was not introduced at trial.

The second statement occurred on the following day when Investigator Andrew Sims administered a polygraph examination to Petitioner.  Sims read Petitioner's constitutional rights to him, and Petitioner indicated that he wanted to speak with Sims.  Petitioner signed the waiver-of-rights form at 6:00 p.m. He made an oral statement before and after the examination, and at 8:45 p.m., he reduced his statement to writing after Sims left the room.[2] Petitioner was cooperative and alert.  He did not complain of being denied food, water, or bathroom breaks, and no threats or promises were made to Petitioner to induce his statement.  Although Petitioner did ask what would happen to him, Sims did not promise to "stick [his] neck out" for Petitioner if he made a statement.  Sims informed Petitioner that he could have the assistance of an attorney, but that the attorney could not be in the room during the polygraph examination.  Petitioner did not request an attorney.  (*Id.* at 47-57.)

---

[2] In his oral and written statements to Investigator Sims, Petitioner stated that he and his friend had begun arguing after his friend accused him of taking some dope and money.  His friend pulled out a weapon, cocked the trigger, and threatened to kill him. His friend laid down the weapon when someone came to the door.  The two of them resumed their argument after the visitor left.  His friend reached for the gun, but he (Petitioner) grabbed it first.  The gun discharged.  His friend then went upstairs, and he followed.  They wrestled for the gun.  He pulled his friend back and fired again.  He became frightened, dropped the gun, and left.  (Tr. Nov. 13, 2002, at 133-37.)

10

The third statement occurred about 10:00 p.m. on January 10, 2002, when Petitioner spoke to Officer Jimenez a second time.[3] Petitioner was cooperative, and Jimenez testified at the suppression hearing that he did not threaten to charge Petitioner's brother with first-degree murder if Petitioner did not talk. Petitioner did not ask for a lawyer, and Jimenez did not tell him that he did not need a lawyer. The statement did not take long because both of them were eating at the time. (*Id.* at 33-40.)

Petitioner testified at the hearing that he spent six or seven hours periodically talking with Officer Jimenez on January 9, 2002. He stated that, initially, he was not cooperative. However, when Officer Jimenez informed him that Petitioner's brother was in the next room and that the police were going to charge his brother with murder, he asked for a lawyer. Jimenez told him that he did not need a lawyer because the police had a dying man's declaration. Officer Jimenez promised to do what he could to help Petitioner and to have the charge reduced to manslaughter if Petitioner told him what happened. Petitioner informed Jimenez that he had a medical condition which required him to eat, but he was given only a candy bar.

Petitioner testified that he spoke with Investigator Sims on January 10, 2002, and that Sims said he could have a lawyer, but not in the room with him. Sims explained to him that, if he wanted an attorney, Sims would have to remove the wires and take him downstairs. After the polygraph examination, Sims offered to stick his neck out for

---

[3] Petitioner admitted to Officer Jimenez that he had lied about "Pokemon" in his first statement to Jimenez. He went on to inform Officer Jimenez that the shooting was done in self defense and that he did not do it intentionally. (Tr. Nov. 13, 2002, at 125-27.)

11

Petitioner if he made a written statement.

Petitioner claimed that he did not sleep the night of January 9, 2002, and that he ate only a sandwich the following morning. He admitted, however, that he was given a couple of hamburgers between the second and third statements. He also admitted that, even though Officer Jimenez had said he would see whether he could help Petitioner, Jimenez never stated what he would do to help him. Petitioner conceded that he was advised of, or reminded of, his constitutional rights before each interview. He also conceded that he did not mention in his handwritten statement that he was denied food, promised leniency, or suffered from post-traumatic stress disorder. (Tr. May 7, 2002, at 65-88.)

After the pretrial hearing, Petitioner was examined for competency to waive his constitutional rights. He was found competent by two examiners, including an independent examiner. (Tr. Oct. 22, 2002, at 97.)

### 3. The State Court Decisions

The trial court determined that Petitioner voluntarily waived his rights. The trial court stated that it was persuaded of Petitioner's voluntariness by the number of statements he gave and by the fact that the police allowed him to write down his own statement during one of the interrogations. The trial court concluded that Petitioner had wanted to write out his version of the facts because he was claiming self-defense. The Michigan Court of Appeals deferred to the trial court's assessment of the credibility of the witnesses and affirmed the trial court's ruling.

### 4. Analysis and Conclusion

12

Although the initial interrogation with Officer Jimenez was prolonged (off and on for about eleven hours according to estimates), courts have determined that detention and periodic interrogation for eleven hours does not necessarily invalidate a confession. *See, e.g., United States v. Huerta*, 239 F.3d 865, 872 (7th Cir. 2001) (concluding that a suspect's detention for approximately eleven hours was a long time, but not oppressively so, because she was not continuously interrogated during that period of time and there was no credible evidence that she was too tired, medicated, or hungry to understand the proceedings); *Grant v. Morris*, 985 F.2d 560, No. 92-3239, 1993 WL 20544 (6th Cir. Feb. 1, 1993) (unpublished decision affirming the District Court's denial of the habeas petition despite the petitioner's claim that his confession was obtained after eleven hours of interrogation at a police station without counsel).   Petitioner was not interrogated continuously.

Furthermore, Petitioner was advised of his constitutional rights and not deprived of food, water, or a restroom.  He was forty years old at the time of his confession, and he had completed two years of college.  He also had prior experience with the criminal justice system.  He had been arrested and questioned by the police on another occasion, and he was familiar with his constitutional rights.

Although Petitioner claims that his physical and emotional conditions were ignored, exhibits to the habeas petition indicate that his leukemia was in remission, and Officer Jimenez testified that Petitioner did not mention his post-traumatic stress disorder. Additionally, Petitioner has not shown that his mental disorder affected the voluntariness of his confessions.  He testified that he was distraught when he made the statements, but Officer Jimenez testified that Petitioner was scared and under stress at the crime scene

13

because the entire neighborhood had been looking for him. After Petitioner was taken to police headquarters, he was a little more cooperative, according to Jimenez.

The Court also notes that, despite the alleged stress, Petitioner had the presence of mind to attempt to exculpate himself in his confessions. In his first confession, he claimed that someone else did the shooting, and in a subsequent confession, he claimed that the shooting was accidental and done in self defense.

Petitioner's allegations that he was promised leniency and was told that the police intended to charge his brother were contradicted by the police officers who denied saying anything to induce Petitioner's statement. Defense counsel admitted that it was a credibility contest, and the Court finds that the officers' testimony was not "exceedingly improbable." *Huerta*, 239 F.3d at 872. Like the Michigan Court of Appeals, this Court must defer to the trial court's assessment of the credibility of witnesses. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (explaining that a federal habeas court has "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them").

The Court concludes that the state appellate court's decision to affirm the trial court's ruling was objectively reasonable. Petitioner therefore is not entitled to relief on the basis of his claim that his confessions were involuntary.

## C. Trial Counsel

Petitioner alleges next that his trial attorney was ineffective for failing to present evidence that he suffers from post-traumatic stress disorder. Petitioner claims that a person with post-traumatic stress disorder reacts violently when startled or frightened. He also claims that, even if evidence of post-traumatic stress disorder were insufficient to

14

establish a defense of insanity or diminished capacity, the evidence would have been relevant to the issues of motive, intent, accident, and self-defense.

The Michigan Court of Appeals stated on review of this claim that the facts did not support the theory that Petitioner was affected by post-traumatic stress disorder at the time of the shooting. The Michigan Court of Appeals concluded that Petitioner was not deprived of a substantial defense that would have made a difference in the outcome of the trial. The Court of Appeals further concluded that Petitioner had failed to overcome the presumption that his attorney's decision not to call witnesses to testify on post-traumatic stress disorder was trial strategy.

### 1. Clearly Established Federal Law

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), "qualifies as 'clearly established Federal law'" for purposes of evaluating ineffective-assistance-of-counsel claims. *Williams*, 529 U.S. at 391. Pursuant to *Strickland*, Petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness" and if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687-88.

The prejudice prong of *Strickland* requires Petitioner to demonstrate "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

15

*Id.* at 694.

"[I]n the context of asking whether counsel adequately investigated his client's defense, the ultimate inquiry is whether the choice not to conduct additional investigation was 'reasonable[ ] in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 691). The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *Knowles v. Mirzayance*, __ U.S. __, __, 129 S. Ct. 1411, 1420 (2009).

### 2. Application

In Michigan, "the insanity defense as established by the [Michigan] Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation." *People v. Carpenter*, 627 N.W.2d 276, 285 (Mich. 2001). Consequently, a trial court may not "allow evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent." *Id.* For this reason alone, defense counsel's failure to present evidence of Petitioner's post-traumatic stress disorder did not amount to deficient performance.

Furthermore, even though an exhibit to the habeas petition confirms that Petitioner was diagnosed with combat-related post-traumatic stress disorder in August of 2001, the record provides no indication that the shooting resulted from a sudden and violent outburst due to being frightened or startled. Nor does it appear that Petitioner lost control over his actions. He consciously grabbed the gun after Mr. Mitchell set it down, and he subsequently followed Mitchell up the stairs where he shot him a second time.

When writing his statement to the police and when speaking with his brother,

16

Petitioner did not blame post-traumatic stress disorder for the shooting. He informed his brother that a bearded man did the shooting. Then he changed his story and said that a man named Pokemon did it. Neither explanation made sense to his brother, but Petitioner stuck to his story. (Tr. Nov. 13, 2002, at 58-59, 62.) Petitioner subsequently informed the police that the shooting was not intentional and that it was done in self-defense.

Petitioner relies on *Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998), as support for his claim that his attorney should have introduced evidence of his post-traumatic stress disorder. The Ninth Circuit concluded in *Seidel* that Seidel's trial attorney was ineffective for failing to research the possibility of presenting a defense related to Seidel's impaired mental state. *Seidel* is distinguishable from this case in that Seidel suffered from organic brain damage in addition to post-traumatic stress disorder.

The Court concludes that Petitioner was not deprived of a viable defense and that Petitioner's trial attorney was not ineffective for failing to introduce evidence of post-traumatic stress disorder. Consequently, the state court's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, *Strickland*.

### D. The Jury Instructions

Petitioner claims that he was denied a fair trial and a properly instructed jury when the trial court failed to instruct the jury on involuntary manslaughter. Petitioner contends that his statement to the police supported a jury instruction on involuntary manslaughter, because he maintained that the shooting was an accident, which occurred during a struggle for the gun. Petitioner maintains that the jury might have convicted him of involuntary manslaughter if they believed that the shooting was accidental, but wanted to avoid absolving him of all charges.

17

The Michigan Court of Appeals reviewed this claim for "plain error," because Petitioner did not preserve the error for appellate review.[4]  The Court of Appeals went on to conclude that the trial court should have instructed the jury on involuntary manslaughter, but a miscarriage of justice did not occur because the error did not affect Petitioner's substantial rights.

The United States Supreme Court has not yet decided whether due process requires the giving of jury instructions on lesser-included offenses in non-capital cases, such as this one.  *See Beck v. Alabama*, 447 U.S. 625, 638 n.14 (1980).  Consequently, the United States Court of Appeals for the Sixth Circuit has held that "the Constitution does not require a lesser-included offense instruction in non-capital cases."  *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (citing *Bagby v. Sowders*, 894 F.2d 792, 795-97 (6th Cir. 1990) (*en banc*)).  "[F]ailure to instruct on a lesser included offense in a noncapital case is not 'such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.'"  *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (quoting *Bagby*, 894 F.2d at 797).

Even if the Court were to find that first-degree murder is the equivalent of a capital

---

[4]  Respondent claims that this issue is procedurally defaulted due to the state court's finding that the issue was not preserved for appeal.  This Court finds no substantive merit in Petitioner's claim, and a federal habeas court need not address a procedural-default issue before deciding against the petitioner on the merits.  *Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008) (quoting *Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)), *cert. denied*, __ U.S. __, 129 S. Ct. 1986 (2009).  The Court therefore will review Petitioner's claim on its merits.

offense,[5] Petitioner is not entitled to relief because the trial court instructed his jury on second-degree murder, voluntary manslaughter, self defense, and accident.  The jury rejected these theories and lesser-included offenses in favor of finding Petitioner guilty as charged.  This strongly suggests that the failure to instruct the jury on the lesser-included offense of involuntary manslaughter "was at most harmless error, because the jury was given the option of convicting [Petitioner] on a lesser-included offense and yet declined to do so." *Abdus-Samad v. Bell*, 420 F.3d 614, 628 (6th Cir. 2005).  In other words, because the jury chose first-degree murder over second-degree murder and voluntary manslaughter and rejected Petitioner's defenses, there is no basis to believe that it would have opted for the lesser offense of involuntary manslaughter over first-degree murder.  *Id.*  The failure to instruct on involuntary manslaughter could not have had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*,  507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)), and was harmless.

### E.  The Felon-in-Possession Conviction

Petitioner's fifth and final claim alleges that the trial court erred when it denied his motion to dismiss the charge of felon in possession of a firearm.  Petitioner asserts that the prosecution failed to prove the elements of the offense beyond a reasonable doubt and that his trial attorney was ineffective for conceding certain elements of the offense.  The Michigan Court of Appeals found sufficient evidence to support Petitioner's felon-in-possession conviction and stated that defense counsel was not ineffective for conceding

---

[5] The offense carries the State's most severe penalty:  life imprisonment without the possibility of parole.  *See* Mich. Comp. Laws § 750.316(1); *People v. Launsburry*, 551 N.W.2d 460, 463-64 (Mich. Ct. App. 1996).

19

two of the three elements of the offense.

The question on review of Petitioner's sufficiency-of-the-evidence claim is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Under state law,

> a person convicted of a specified felony is prohibited from possessing a firearm until five years after he has paid all fines, served all terms of imprisonment, and completed all terms of probation or parole imposed for the offense. MCL 750.224f(2)(a). Moreover, after the five-year period has passed, the convicted felon is prohibited from possessing a firearm until his right to do so has been formally restored under MCL 28.424. MCL 750.224f(2)(b). The prosecutor must prove that the defendant's right to possess a firearm has not been restored only if the defendant produces some evidence that his right has been restored. MCL 776.20.

*People v. Perkins*, 686 N.W.2d 237, 240 (Mich. Ct. App. 2004).

### 1. Use or Possession

Petitioner claims that the prosecutor failed to prove that he used or possessed a firearm during the offense. However, in his statement to the police, Petitioner admitted that he grabbed Mr. Mitchell's gun and later dropped it after it discharged. A rational juror could have concluded that Petitioner possessed and used a firearm during the incident in question.

### 2. Specified Felony

Petitioner claims next that his prior out-of-state offense was not a specified felony under state law. A "specified felony" is one involving "the use, attempted use, or threatened use of physical force against the person or property of another, or that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Mich. Comp. Laws §

20

750.224f(6)(i).

Defense counsel stipulated that Petitioner's prior conviction was a "specified felony." (Tr. Nov. 13, 2002, at 5-6; Tr. Nov. 14, 2002, at 3-4, 9.)  Furthermore, the prior felony was an armed robbery, which meets the definition of a "specified felony" because it involves the use, attempted use, or threatened use of physical force against another person.  The prosecutor therefore proved the "specified felony" element of felon in possession of a firearm.

### 3.   Restoration of Rights

Petitioner's final challenge to the elements of the offense alleges that the prosecutor failed to prove that his rights had not been restored.  Petitioner claims that he was eligible to possess a firearm because more than five years had elapsed since his discharge from his prior conviction and sentence.  While that appears to be true, Petitioner's trial attorney stipulated that, Petitioner's rights had not been restored.  (Tr. Nov. 13, 2002, at 5-6; Tr. Nov. 14, 2002, at 3-4, 9.)  Thus, the eligibility element of the offense was satisfied.

### 4.   Trial Counsel's Concessions

Petitioner's final claim alleges that his attorney was ineffective for conceding the eligibility element of felon in possession of a firearm.  Petitioner, however, has not produced any evidence demonstrating that his rights were restored.  He admits, in fact, that he did not apply to have his rights restored.  *See* Petitioner's Response to Respondent's Answer in Opposition to Petition for Writ of Habeas Corpus, at 15.  The prosecution was not required to prove the contrary beyond a reasonable doubt.  *Perkins*, 686 N.W.2d at 240. Defense counsel therefore was not ineffective for conceding that Petitioner's rights had not been restored.

In conclusion, Petitioner's attorney stipulated to two elements that were easily verifiable, and the prosecutor produced sufficient evidence to prove the third element of the offense. The state court's decision, therefore, was not contrary to, or an unreasonable application of, *Jackson* or *Strickland*.

## IV. Conclusion

The state appellate court's rejection of Petitioner's claims did not result in an unreasonable application of the facts, and it was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Accordingly, the habeas petition [Dkt. #1] is **DENIED**.

## V. Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "It is consistent with § 2253 that a [certificate of appealability] will issue in some instances where there is no certainty of ultimate relief. After all, when a [certificate of appealability] is sought, the whole premise is that the prisoner 'has already failed in that endeavor.'" *Miller-El*, 537 U.S. at 337 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "[A] claim can be debatable even though every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that [the] petitioner will not prevail."  *Miller-El*, 537 U.S. at 338.

Reasonable jurists could find the Court's resolution of Petitioner's first three habeas claims to be debatable, but they would not find the Court's resolution of habeas claims IV and V to be debatable or wrong.  The Court therefore **GRANTS** a certificate of appealability on claim I (insufficient evidence of first-degree murder), claim II (involuntary confession), and claim III (ineffective assistance of counsel), but **DECLINES** to issue a certificate of appealability on claim IV (failure to instruct on involuntary manslaughter) and claim V (insufficient evidence of felon-in-possession).  Petitioner may proceed *in forma pauperis* on appeal because an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3).

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  January 28, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 28, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

23

24